IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE FORKLIFT LP CORPORATION<br>f/k/a Clark Material Handling<br>Company, et al.,<br><br>    Debtors. | )<br>)<br>)  Chapter 11<br>)  Case No. 00-1730-LHK<br>)<br><br>) |
| FORKLIFT LIQUIDATING TRUST as<br>successor in interest to Forklift<br>LP Corporation<br>f/k/a/ Clark Material Handling<br>Company, et. A.,<br><br>    Plaintiff,<br><br>    v.<br><br>SPICER CLARK-HURTH,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 02-1073-SLR<br>)<br>)<br>)<br>) |

---

Eric Lopez Schnabel, Esquire and Jennifer M. Becnel-Guzzo,
Esquire of Klett Rooney Lieber & Schorling, Wilmington, Delaware;
Lori A. Dawkins, Esquire of Steptoe & Johnson, PLLC, Clarksburg,
West Virginia.  Counsel for plaintiff.

David E. Wilks, Esquire and William D. Sullivan, Esquire of
Buchanan Ingersoll PC, Wilmington, Delaware.  Counsel for
defendant.

---

**OPINION**

Dated: July 20 , 2006
Wilmington, Delaware

ROBINSON, Chief Judge

# I.   INTRODUCTION

On April 17, 2000, Clark Material Handling Company ("Clark")
filed voluntary petitions for relief under Chapter 11 of Title 11
of the United States Code, 11 U.S.C. §§ 101, et seq. in the
United States Bankruptcy Court for the District of Delaware.
Plaintiff Forklift LP Corporation ("plaintiff") is the trust
created in the aftermath of Clark's Chapter 11 bankruptcy
proceedings, through which all of Clark's operating assets were
sold or liquidated.   Plaintiff filed this action under 11 U.S.C.
§ 547 seeking the avoidance of transfers that Clark made to
defendant Spicer Clark-Hurth on antecedent debt during the 90
days preceding Clark's entry into bankruptcy.   A bench trial took
place on April 4 through April 6, 2005.

# II.   FINDINGS OF FACT

Clark Equipment Belgium and Clark were sister companies
belonging to one group, Clark Equipment Company.   (D.I. 33 at 7)
The Clark-Hurth component of these companies was sold to Dana
Corporation in February 1997 and became Spicer Clark-Hurth
("Spicer").   (Id. at 5, 9)   Spicer designs and manufactures
hydrodynamic transmissions for off-highway machines.   (Id. at 6).
Spicer oversees the Brugges plant of Dana Corporation in Belgium,
which has been in operation since 1969.   (Id. at 179, 7)   Spicer
manufactures transmission and axles which are combined into one
unit for Clark.   (Id. at 7)   Clark was Spicer's biggest customer,

representing between 20 and 25 percent of Spicer's sales revenue
throughout all the years at issue. (Id. at 8)  In 1999, the
sales to Clark were around $25 million. (Id. at 101)  When the
companies split in 1997, the intercompany relationship between
the companies remained close through 2000. (Id. at 9, 10)
Indeed, intercompany sales were consummated without involving the
respective sales departments, a relationship that was not
maintained with any other of Spicer's customers. (Id. at 10)
Clark was Spicer's only direct customer in the United States.
(Id. at 121)  Spicer's normal payment terms with its customers
were 30 days net; 30 additional days were added for Clark because
Clark was located overseas. (Id. at 121)

    Clark's payments and accounts receivable were monitored by
Firmin Devliegher, the collection manager in Spicer's control
department. (Id. at 15, 111)  Around 1990, Mr. Lully, the
financial controller at Spicer, together with Mr. Devliegher,
established a written procedure for credit and collection. (Id.
at 86)  The procedure included the following terms: (1) Every
month at the closing of the books, detailed statements showing
the details of unpaid invoices would be sent out to customers and
the salespeople; (2) 15 days after the amount comes due, if not
paid, there would be phone contact with the customer; and (3) 60
days after the payment becomes overdue, the finance department
would contact the salesperson and the salesperson would visit the

3

customer. The control department was to overlook and monitor the collection of the payments. (Id. at 15, 110) This function was done on a daily basis and Mr. DeSchuyter, the general manager of the Brugges plant, was given a monthly report on all of Spicer's customers. (Id. at 15) Spicer's standard procedures for dealing with customers who had past due invoices in excess of 90 days was to repeatedly call and eventually employ a stop ship.¹ (Id. at 16-17) After a payment was 60 days past due, all necessary documentation normally would be given to the salespeople in order to try to collect the money. (Id. at 94, 112) If this did not work, the customer may be placed on a stop ship with the involvement of the salespeople. (Id. at 95) Spicer had placed many customers on stop ships. (Id. at 95)

Clark paid Spicer by sending checks to Belgium. (Id. at 121) Due to the delay in receipt of the money, Spicer requested that Clark send the checks directly to a Dana Corporation facility in the United States. (Id. at 122) At some point in 1998 or 1999, Spicer requested the payments be made by wire transfer. (Id. at 122)

Between the period of 1996 to 2000, Clark was occassionaly the customer with the largest past-due balance in the monthly reports. (Id. at 17) In 1998, Clark was considered a normal

---

¹A stop ship is refusing to ship further product until the customer pays. (Id. at 17)

4

customer, although its financial condition  was deteriorating.
(Id. at 18, 113, 125)  By 1999 Clark's accounts receivable amount
had increased to more than $7 million.[2]  (Id. at 126)  In
response, the credit collection department of Spicer, headed by
Mr. Devliegher, was corresponding directly with the payment
department from Clark.  (Id. at 26, 112)  In the late summer and
early fall of 1999, Mr. Devliegher informed Frank Martin, a Dana
division controller, of the situation with Clark and asked for
help in collecting the money.  (Id. at 113, 154, 71)  Neither Mr.
Martin nor any other Dana division controller had ever been
involved in collection efforts from Spicer clients.  (Id. at 131)

On September 22, 1999, Mr. DeSchuyter sent a letter to Clark
whereby he demanded that the past due amounts be reduced and
proposed a schedule of payments to accomplish a reduction.  (Id.
29, 32)  The proposal stated that by October 1st, there should be
no payment with more than 90 days overdue; by October 15th, no
payments overdue by 60 days; by November 1st, no payments more
than 30 days overdue; and by December 1, all payments should be
current.  (Id. at 32, DTX 3)  If the demand was not met, a stop
ship would occur.  (Id. at 32)  The response from Clark was
payment of some of the past due invoices, but not all.  (Id. at
39)  Spicer, however, did not stop ship because it did not

_____

[2]In December of 1998, Clark's accounts receivable balance
was $1,983,458.  (Id. at 25)  By September of 1999, it had grown
to $7,791,028.  (Id. at 25)

5

believe there was a question of bad will; if it had put Clark on stop ship, "it would have killed [Clark] immediately," which was not in the interest of Spicer. (Id. at 39, 40) Indeed, Spicer never employed a stop ship with Clark but, rather, continually pushed Clark for a plan to bring it current over time with the past due amounts. (Id. at 41)

Ongoing steps to collect payment were taken by Spicer's collection department. (Id. at 44) During October of 1999, Mr. Devliegher was making almost daily phone calls to Clark, most of which were unsuccessful and resulted only in voicemail messages. (Id. at 93, 115) Making regular phone calls to customers whose invoices remained past due was a normal practice of Mr. Devliegher and part of his job. (Id. at 144) While the situation, from the payer's side (Clark), was not normal because payments were not being made on time, Mr. Devliegher stated that the situation on Spicer's side was normal because goods were being sent to a customer and invoices were being issued. (Id. at 144)

Mr. Martin from Dana Corporation (Spicer's parent corporation) was appointed to manage the situation because Spicer wanted to emphasize to Clark that this was an important situation. (Id. at 44-5) Mr. Lully sent Mr. Martin an email in October with several documents attached, including the status of Clark as of October 18, 1999 and a detail of all the unpaid

6

invoices as of that date.  (Id. at 97)  The purpose of this email
was to protect the assets of Spicer; Mr. Lully was concerned
about Spicer's exposure going up to a level of $20 million and,
being located in Belgium, he was unable to get in touch with
Clark due to the time differences and limited time frame for
phone calls.  (Id. at 98)

By December 1999, Mr. Martin had appointed Tom Stevens to be
the daily monitor of the situation.  (Id. at 45-6, 72, 81, 132)
This was the first time Mr. Stevens, a sales account manager at
Spicer, had ever been involved with monitoring and communicating
with respect to collection issues.[3]  (Id. at 133, 179)  Mr.
Stevens testified that contacting a person such as Guy Goodner at
Clark to discuss payments is the type of thing he has done with
other customers and, while it is usually at the accounts payable
level, it is typical for a sales representative to get involved.
(Id. at 186)  Mr. Stevens relayed information to Mr. DeSchuyter,
Mr. Martin and all others concerned.  (Id. at 47)  This
implementation was completed in early January 2000.  (Id. at 47)

On January 21, 2000, Mr. Stevens set up a conference call in

---

[3]Prior to the fall of 1999, Mr. Stevens had no involvement
with the Clark account on behalf of the Brugges facility.  (Id.
at 180)  He was an account manager in sales previously designated
to be the salesperson for Clark on paper but, because of the
unique relationship between Clark and Spicer, had not been
involved.  (Id. at 46, 145)

which Mr. DeSchuyter, Mr. Martin and Mr. Goodner participated.[4] (Id. at 48-9, 158)  During the conference call, Spicer "put a number forward" as a demand for payments.  (Id. at 49)  It was agreed that Mr. Goodner would send to Mr. Martin a payment plan to reduce the accounts payable.  (Id. at 48)  Mr. Goodner informed Mr. Martin that Clark proposed a payment plan of $500,000 a week from January 28th to March 17th.  (Id. at 49, 159)  Mr. Martin counseled Mr. Stevens that the payment for January 28th should be $750,000 and not as proposed by Clark. (Id. at 56, 188)  In response to a suggestion to increase the amounts, a contact at Clark represented that Clark was unable to pay more than $500,000.  (Id. at 57, 118, 189)  Clark made payments of around $500,000 and missed the first payment in February by paying approximately $415,000.  (Id. at 58)  This was the first time in Mr. Devliegher's history as the credit manager at Spicer that Clark had made consecutive payments of nearly $500,000 a week, every week.  (Id. at 143)  Around March 16, 2000, a plan was suggested to reduce the payments to $300,000. (Id. at 58-9, 191-92)  Spicer did not approve this reduction in payment but, nonetheless, payments going forward were for $300,000 a week.  Spicer had never implemented a similar payment plan before with Clark and it was unusual for Spicer to receive

---

[4]The preference period began on January 17, 2000 and ran to April 17, 2000.

8

payments on a weekly basis from Clark.  (Id. at 199)

In normal situations, Mr. DeSchuyter would not get involved
with respect to collection issues.  (Id. at 27, 64, 126)   Mr.
DeSchuyter admitted that "a normal business situation is when you
get paid on time" and, as of September 22, 1999, Clark was not
paying Spicer on time.  (Id. at 65)   While it was not normal to
bring in the top management to collect money, Mr. DeSchuyter's
responsibility was to inform management of the issues because of
the business risk at stake.  (Id. at 65, 68)   It was not typical
for Spicer to accept payments 90 days past due but, at times,
Spicer had customers who had invoices 90 days past due.  (Id. at
76, 102)

Mr. Sheets, Spicer's expert, concluded that "the activity of
invoicing and payments during the preference period . . . was in
the ordinary course when compared to the relevant historical
period that preceded it by a year."  (D.I. 34 at 14)   In reaching
his conclusion, Mr. Sheets took the raw data and calculated the
weighted days outstanding, which measures the relative weights of
various invoices and their related payments with the days being
weighted by the invoice dollar amount.[5]  (Id. at 14-5)   He then
categorized, in 30 day increments, the invoices by the number of

---

[5]The weighted average was calculated by multiplying the
amount of the invoice by the days it took to get paid and then
dividing that value by the total amount of the invoices in the
data set.  (Id. at 67)

9

days outstanding between the issuance of the invoice to the
payment of the invoice, starting at zero to 30, 30 to 60, and
going up to 120-plus days. (Id. at 15-6) Zero to 60 was within
terms, 60 to 90 is up to 30 days past due, and 90 to 120 is
between 30 and 60 days past due. (Id. at 16) The complete set
of data available for the analysis began in January 1998 and went
through the preference period, which was mid-April 2000. (Id. at
17)

The weighted average days in the 24-month historical period
was approximately 97 with approximately 83% of all the invoices
being paid within a 60 to 90 day time frame. (Id. at 17) The
weighted average days in the preference period[6] was approximately
154 days with 80% of the invoices being paid in an over 90 day
time frame. (Id. at 17) However, Mr. Sheets found a significant
shift in payment patterns between the two parties starting in
late March of 1999 into early April of 1999. (Id. at 18-9) In
the beginning of April of 1999, there was a significant growth
and then a new heightened weighted days level that sustained
itself for a twelve month period up until the filing of the
bankruptcy. (Id. at 19) For the approximate first five
quarters, beginning with the first quarter of 1998 through the
first quarter of 1999, there was a relatively stable preservation

---

[6]The preference period is the 90 day period prior to filing
bankruptcy. (Id. at 17)

of weighted days outstanding of about 71 days.  (Id. at 22)

There were only three or four instances where the amount was in

excess of 100 days.  (Id. at 28)  After the shift at the end of

March and beginning of April 1999, a new weighted days

outstanding level was maintained at around 134 days.  (Id. at 22)

This nine month historical period, starting with the payment on

April 6, 1999 and ending on January 25, 2000, is referred to by

Mr. Sheets in his testimony as the "relevant historical period."[7]

(Id. at 28)  In the relevant historical period, the majority of

payments, roughly 80%, were also paid in the over 90 day time

frame.[8]  Mr. Sheets used the observed 134 day weighted days of

---

[7]The parties contest whether this analysis was completed in
Mr. Sheets' report.  The term "relevant historical data" does not
exist in the report.

[8]

TABLE 1: Summary of Mr. Sheets' Analysis of Spicer's Payment
Patterns

|  | | Number of Days From Invoice Date to Payment Date | | |
|---|---|---|---|---|
|  | Weighted Average Days Outstanding | 0 - 60 Days | 61 - 90 Days | 91 - 120 Days | Over 120 Days |
| Historical Period Payments (15 Months) | 71.33 | 101 13.3% | 635 82.9% | 14 1.8% | 15 2.0% |
| Relevant Historical Period Payments (9 Months) | 134.29 | 22 6.3% | 18 5.1% | 112 32.0% | 198 56.6% |
|  |  | 11 |  |  |  |

the "relevant historical period" to compare to the weighted days of the preference period in his analysis of whether the preference period payments were in the ordinary course of business. (Id. at 37) Using the value of roughly 134 for the relevant historical period and the value of 154 for the preference period, Mr. Sheets concluded that the variance was 14.75% and that the preference period payments were in the ordinary course of business.[9] (Id. at 42, 120) Mr. Sheets used a value of 20 percent, either high or low, over what was in the relevant historical period to be an acceptable range for ordinary course. (Id. at 42)

Mr. Sheets did not perform an analysis of, or reach a conclusion on, whether the payments were considered "ordinary" within the industry standard. (Id. at 46, 141) Mr. Sheets testified that there was not a comparable body of information that he could use to make such a determination.[10] (Id. at 46) Instead, Mr. Sheets looked at the behavior between the two

| Preference Period Payments | 154.10 | 0 0.0% | 25 16.2% | 32 20.8% | 97 63.0% |
|---|---|---|---|---|---|

(DTX 12)

[9]The percent variance for the 15 month historical period was 116.02%. (DTX 12)

[10]Mr. Sheets did not use RMA data because Spicer is not a United States company and because the level of activity between Spicer and Clark put it outside the relevancy of RMA. (Id. at 47)

12

companies.  (Id. at 46)  Mr. Sheets took into consideration the
fact that Spicer and Clark were at one time the same company,
they are co-dependent on one another because of the proprietary
nature of the product, the level of sales, and their long
established relationship.  (Id. at 47-8)

    Ms. Etlin, Clark's rebuttal expert, concluded that Mr.
Sheets' analysis was flawed and the conclusion that the payments
made in the preferences period were in the ordinary course is
incorrect.  (Id. at 63-4)  Ms. Etlin did not perform a typical
ordinary-course opinion report, but rather rebutted Mr. Sheets'
report.  (Id. at 64)  Ms. Etlin began with utilizing all of the
information that Mr. Sheets relied upon and attempted to
regenerate the same mathematical analysis that Mr. Sheets
performed.  (Id. at 66)  Ms. Etlin found some inconsistencies
with the use of credit memos in the analysis; Mr. Sheets used
some credit memos in his analysis, but not all.  (Id. at 66)
However, the use of all or none of the credit memos does not
result in a material difference in the pattern shifts.[11]

---

[11]

TABLE 2: Summary of Average Days Outstanding By Mr. Sheets Using
Some Credit Memos And By Ms. Etlin, Using All Credit Memos And No
Credit Memos

| | Mr. Sheets' Calculation of Weighted Average Days Outstanding | Weighted Average Days Outstanding Analyzing Only Invoices Paid | Weighted Average Days Outstanding Analyzing Invoices and Credit Memos |
|---|---|---|---|

Using Mr. Sheets' calculation of the historical weighted average

days outstanding, 97.3,[12] and the average weighted days

outstanding in the preference period, 154.1,[13] Ms. Etlin

calculated a 56.8 day differential,[14] which is a 58.4% variance,

well above the 20% value used by Mr. Sheets to determine ordinary

course.  (Id. at 68)  Regardless of the methodology used

regarding the credit memos, Ms. Etlin concluded that the numbers

clearly show a shift between the preference period payments and

| Average Weighted Days Outstanding - Historical Period Payments | 97.3 | 96.3 | 97.4 |
|---|---|---|---|
| Average Weighted Days Outstanding - Preference Period Payments | 154.1 | 151.8 | 163.6 |
| Days Variance | 56.8 | 55.5 | 66.2 |
| Percentage Variance | 58.4% | 57.6% | 68.0% |

(PTX 15)  Ms. Etlin, believing that the correct analysis would
exclude all use of credit memos, independently calculated the
weighted days outstanding in the historical period and in the
preference period when all the credit memos were excluded.  For
consistency she did the same analysis when all of the credit
memos were included.  (Id. at 69)

[12]Compared to Ms. Etlin's calculated value of 96.3, Ms.
Etlin acknowledged that this is not a material difference in
value.  (Id. at 113)

[13]Compared to Ms. Etlin's calculated value of 151.8, Ms.
Etlin acknowledged that this is not a material difference in
value.  (Id. at 113)

[14]Calculated by subtracting one value from the other.  (Id.
at 68)

14

the historical period payments. (Id. at 70)

Ms. Etlin also used Mr. Sheets' data to examine the clustering of the payments. (Id. at 72) She calculated that 58.5% of all the payments in the historical period clustered in a single 30 day aging category, which is 61 to 90 days. (Id. at 72) In the preference period, 63% of the payments were in the over 120 day category.[15] (Id. at 72) Ms. Etlin performed the same analysis using all the credit memos and then using none of the credit memos and concluded the data remained substantially the same; a dramatic shift occurred from the historical period to the preference period. (Id. at 73) Ms. Etlin stated that she would not render a report based solely on this data, because such a dramatic shift in the data could result if there were, for example, a true change in the business relationship. (Id. at 76) Looking at the deposition transcripts and correspondence between the parties, Ms. Etlin found no evidence of such a business change associated with this shift in pattern. (Id. at 76) Rather, there was merely a deteriorating financial condition of a customer and a stretch in payments that Spicer allowed to occur. (Id. at 76-7)

Ms. Etlin stated she found it "hard to believe" that Mr. Sheets was unable to do an industry practice analysis. (Id. at

---

[15]Ms. Etlin calculated that 16% were paid in the 61 to 90 category and 21%, rounding up, were paid in the 91 to 120 period. (Id. at 75)

15

92)  Ms. Etlins reasons were:  (1) Mr. Sheets performed such an
analysis in his report pertaining to Dana Corporation;[16] (2) he
could have taken the RMA data and added 30 days to account for
Spicer's overseas location; (3) he could have looked at the
average payable days outstanding for forklift companies; (4) he
could have looked at the receivable days outstanding for a
variety of companies comparable to Spicer.  (Id. at 92-3)[17]

     Ms. Etlin addressed Mr. Sheets' testimony regarding the nine
month "relevant historical period."  (Id. at 93)  Ms. Etlin
analyzed the data again first as Mr. Sheets had done, then
without any credit memos included and, finally, with all credit
memos included; she reached the same conclusion as above:  The
inclusion or exclusion of the credit memos did not affect the
overall shifting patterns.  (Id. at 96)  Ms. Etlin extended the
classification system to examine the clusterings above 120 days
because a large percentage fell into the over 120 day category.
The majority of payments in the nine month period fell in the 91
to 120 and 121 to 150 day categories and the majority of payments
in the preference period fell within the 151 to 180 and over 180

---

[16]The difference between Spicer and Dana is that Spcier was
in Belgium and was foreign and Dana was in the United States.
(Id. at 182)

[17]Spicer asserts that the only suggested method contained in
Ms. Etlin's report was using the RMA.  (Id. at 161)

day categories.[18]  (Id. at 96-7)  Ms. Etlin did not agree with

the use of a nine month historical period because she believed

the full available historical period between the parties is the

relevant data, unless a true substantive business relationship

change occurred.  However, she analyzed the data solely to rebut

Mr. Sheets.  (Id. at 97)  Ms. Etlin still found a "dramatic

shift" in the average between the nine month historical period,

134.3, and the preference period, 163.6, with a percentage

variance of 21.8% when the credit memos were included.  (Id. at

100, PTX 16)  Admittedly, Ms. Etlin classified the shift as "not

as dramatic as that which occurred in the historical period."

(Id. at 100)  In the nine month historical period, the largest

cluster of payments are in the 91 to 120 day category, 32%, and

the 121 to 150 day category, 34%, totaling 66%.[19]  (Id. at 100,

122)  In the preference period, the largest single cluster in any

---

18

TABLE 3: Ms. Etlin's Summary of Payments By Clark

|                                             | 0 - 60 Days | 61 - 90 Days | 91 - 120 Days | 121 - 150 Days | 151 - 180 Days | Over 180 Days |
|---------------------------------------------|-------------|--------------|---------------|----------------|----------------|---------------|
| 9 Month Historical Period Payments          | 22 6.3%     | 18 5.1%      | 112 32.0%     | 120 34.3%      | 29 8.3%        | 49 14.0%      |
| Preference Period Payments                  | 0 0.0%      | 25 16.2%     | 32 20.8%      | 25 16.2%       | 41 26.7%       | 31 20.1%      |

(PTX 17)

[19]Ms. Etlin was using the data from the analysis including
credit memos.  (PTX 16)

17

30 day period is in the 151 to 180 day category, representing
25.2%, and the next two largest clusters in the over 180 day
category, representing 19.6%, and the 91 to 120 day category,
representing 19.6%.[20]  (Id. at 100, 123, PTX18)  Ms. Etlin
focused on the clusterings because the "averages can cover up a
lot of anomalies."  (Id. at 102)  Ms. Etlin, in her analysis, did
not stop the categories at over 120 days, but rather extended the
30 day categories to 121 to 150, 151 to 180 and then over 180
days to adequately take into account what happened in the payment
pattern as opposed to "dump[ing]" all the payments over 120 days
into one category.  (Id. at 104)

## III. CONCLUSIONS OF LAW

Assuming other statutory elements are met, when a debtor
makes a payment to an ordinary unsecured creditor within 90 days
before declaring bankruptcy, the payment becomes an avoidable
"preference."  See 11 U.S.C.A. §§ 547(b), (f) (1993).  If so, the
debtor's estate will be able to recoup the payment.  In re Molded
Acoustical Products, Inc., 18 F.3d 217, 219 (3d Cir. 1994)  Under
11 U.S.C. § 547(c)(2), an "ordinary course defense" or "ordinary
course exception" is available to a creditor and permits the

---

[20]Analyzing the data excluding credit memos, the categories
with the largest clusterings remain the same, but the values
change slightly.  In the nine month historical period, the
largest category is still 121-150 days, with 38.5%, and the next
is 91-120 days, with 35.9%.  (PTX 18)  In the preference period,
the largest clustering is still 151-180 days, with 26.3%, and the
next is over 180 days and 91 to 120 days, with 20.5%.  (PTX 18)

creditor to retain transfers made by the debtor to the creditor during the preference period if three requirements are met:  (1) such transfers were made for a debt incurred in the "ordinary course of business" of the parties; (2) the transfers were made in the "ordinary course of business" of the parties; and (3) the transfers were made in accordance with "ordinary business terms".

In order to successfully utilize the ordinary course defense, the creditor must prove by a preponderance of the evidence that the preferential period transaction between creditor and debtor meets the three subparts of § 547 (c)(2). The three subparts must be read in the conjunctive.  J.P. Fyfe, Inc., of Florida v. Dradco Supply Corp., 891 F.2d 66, 69-70 (3d Cir. 1989).

The preference rule and its ordinary course exception are designed to balance the interests of the debtor and creditor.  As the Third Circuit has explained:

> On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor.  On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

In re Molded Acoustical Products, Inc., 18 F.3d 217, 219 (3d Cir.

19

1994). To put the point differently, the ordinary course exception offers an incentive for creditors to maintain a constructive relationship with debtors. "[W]hen the relationship in question has been cemented long before the onset of insolvency - up through and including the preference period - we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business." Id. at 224-225.

To meet the § 547(c)(2)(A) requirement, the transaction need not have been common, it need only be ordinary. The debt must have been incurred in an ordinary manner, based on its consistency with other business transactions between the parties. In re Valley Steel Corp., 182 B.R. 728, 735 (Bankr. W.D. Va. 1995). A transaction can be ordinary while still occurring only occasionally between the parties. J.P. Fyfe, Inc., 891 F.2d at 68. The court finds that Spicer has satisfied its burden to prove that the transfers at issue were made for debts incurred in the ordinary course of business.

The determination of whether a creditor has met its burden under § 547(c)(2)(B) is a subjective test which considers the consistency of transactions between the debtor and creditor before and during the preference period. In re First Jersey Sec., 180 F.3d 504, 512 (3d Cir. 1999); see also J.P. Fyfe, Inc.,

891 F.2d at 71.   In determining whether payments were made in the
ordinary course of the parties' dealings, courts consider such
factors as:   (1) The length of time the parties engaged in the
type of dealing at issue; (2) Whether the subject transfers were
in an amount more than usually paid; (3) Whether the payments at
issue were tendered in a manner different from previous payments;
(4) Whether there appears to be an unusual action by the debtor
or creditor to collect on or pay the debt; and (5) Whether the
creditor did anything to gain an advantage (such as gain
additional security) in light of the debtor's deteriorating
financial condition.   In re Parkline Corp., 185 B.R. 164, 169
(Bankr. D. N.J. 1994).   Where the parties have a long history of
dealings, the focus is on those dealings; where the parties have
a short history of dealings, the creditor is required to fill the
"gap" by reference to a more extensive and exacting analysis of
industry standards.   In re U.S. Interactive, Inc., 321 B.R. 388,
392-93 (Bankr. D. Del. 2005).   By itself, lateness of payment
does not preclude a finding that the payment was made in the
ordinary course; a pattern of late payments can establish an
ordinary course between the parties.   In re Big Wheel Holding
Co., 223 B.R. 669, 674 (Bankr. D. Del. 1998).   Extraordinary
collection efforts can bring payment efforts outside the ordinary
course of business even when a differing payment interval alone
is not enough to do so.   In re Molded Acoustical Products, Inc.,

18 F.3d at 228.

The court concludes that Spicer has not satisfied its burden
to prove that the transfers at issue were made in the ordinary
course of business of the parties.  Although Spicer attempts to
rely on the long history between the two parties for the industry
analysis, Spicer ignores this data in its ordinary course
analysis.  The court declines to use Mr. Sheets' nine month
"relevant historical period" for determining the baseline
dealings in the ordinary course analysis.  The Third Circuit has
stated that "the most important thing is . . . that [the dealings
between the debtor and creditor] conform to the norm established
by the debtor and creditor in the period before, preferably well
before, the preference period."  Molded Acoustical, 18 F.3d at
223.  Mr. Sheets presented no substantiated explanation as to why
the nine month relevant historical period was examined.  Instead,
the court recognizes that the entire historical period is
relevant to determine the baseline dealings between the parties.
The historical period had an overall weighted average of the days
outstanding of 97, using Mr. Sheets' calculations.  When this
data is contrasted to the preference period data, a value of 154
days outstanding, a 58.4% increase in total days outstanding is
observed.  In addition, there is a change in the array of
invoices from the historical period to the preference period.
During the historical period, 58.5% of the invoices were paid 61

to 90 days after the invoice data and only 19.1% were paid over
120 days after the invoice date.  During the preference period,
63.0% of the invoices were paid more than 120 days after the
invoice date with only 16.2% paid 61 to 90 days after invoice.
The court concludes that Spicer has not satisfied its burden of
showing the payments were made in the ordinary course under the
empirical test of § 547(c)(2)(B).

The non-empirical analysis also illustrates that Spicer has
not met its burden.  The payment plan implemented during the
preference period was a first for the parties in their business
relationships.  Never before had Clark made consecutive weekly
payments in such amounts.  The method of payment changed and
several unusual actions were taken by Spicer to collect the Clark
debt, including increasing the pressure on Clark and getting
higher management and Dana Corporation involved in the
collection.  The court concludes Spicer has not shown that the
transfers at issue were made in the ordinary course of business
of the parties.

The third prong of § 547(c)(2), subpart (C), involves an
objective test regarding the billing practices generally within
the relevant industry as opposed to the subjective test relating
solely to the dealing between the parties set forth in the
previous discussion of subpart (B).  In re Sacred Heart Hospital
of Norristown, 200 B.R. 114, 116 (Bankr. E.D. Pa. 1996).  A

23

creditor has no affirmative defense to a § 547(b) avoidance
action unless it is proven that the preferential transfers at
issue were made "in harmony with the range of terms prevailing as
some relevant industry norms."  In re Molded Acoustical Products,
Inc., 18 F.3d at 226.  The Third Circuit has adopted a "sliding
scale" approach to compliance with the industry standard.  Id. at
224.  Thus, the creditor is not required to prove rigorous
definitions of either the industry or the credit standards within
that industry.  The creditor must establish, however, a "range of
terms" on which "firms similar in some general way to the
creditor" deal.  Id.  The court, therefore, is directed to make
three inquiries in this regard.  First, the court must consider
"the range of terms on which firms comparable to [the creditor]
on some level provide credit to firms comparable to the debtor on
some level."  Id. at 227.  Second, the court must consider "the
length of the parties' relationship predating the debtor's
insolvency to estimate the size of the customized window
surrounding the industry norm which was established in the first
step."  Id.  Finally, the court inquires "whether the
relationship remained relatively stable leading into and
throughout the insolvency period."  Id. at 227-228.

     The court concludes that Spicer presented no evidence at all
concerning the billing practices generally within the relevant
industry.  The limited testimony as to Spicer's billing practices

with other customers does not satisfy this requirement.  Although
the court finds it difficult to reconcile the fact that debtor
continued to order parts from Spicer to survive, yet declines now
to pay Spicer for its services, nevertheless, the statute and
related case law require a certain quantum of proof, and Spicer
has failed to provide such.

## IV.   CONCLUSION

For the reasons stated, the court shall enter judgment in
favor of plaintiff and against defendant.  An order shall issue.

25